[Civ. No. 8489. Third Dist. Dec. 9, 1954.]

IRA ODLE, Respondent, v. JAMES DUNBAR, Appellant.

Carr & Kennedy for Appellant.

F. H. Bowers for Respondent.

SCHOTTKY, J.—Plaintiff commenced an action against defendant to recover for damages to plaintiff's airplane when it was blown upside down at defendant's airport, the complaintiff alleging that defendant had failed to use ordinary care in the storage of the plane. Defendant denied the material allegations of the complaint and also set up an affirmative defense that the relationship of depositary for hire had terminated prior to the time the plane was damaged. The action was tried by the court, sitting without a jury, and the court found "that after December 31, 1949, plaintiff's aeroplane was left at the defendant's hangar at the instance and request of the defendant's agent and for defendant's benefit; that the bailment was not in fact a gratuitous one; that the defendant was obliged, at the time of the damage to said aeroplane, to exercise ordinary care in its preservation; that defendant did not exercise ordinary care but was guilty of negligence in removing said aeroplane from the hangar where it had been stored and negligently placing it outside and tied down in such a manner that the wind tipped it upside down and damaged the aeroplane." Judgment in the sum of $1,500 was entered in favor of plaintiff and this appeal is from said judgment.

Appellant states that "The sole question raised by this appeal is whether the evidence supports the finding that appellant was bailee for hire on January 13, 1950, the date of the damage to respondent's plane?" Appellant does not raise the question of negligence and concedes that the appellant was a bailee for hire until January 7, 1950. However, it is appellant's position that upon this latter date he ceased to be a bailee for hire by reason of having terminated the bailment upon notice as authorized by Civil Code, section 1854.

The record shows that commencing in January, 1947, respondent rented from appellant, the owner of the Roseville Airport, storage space for respondent's airplane in appellant's hangar on a month to month oral agreement for the sum of $15 per month. This arrangement continued without in-

terruption until December, 1949, at which time John Parris, appellant's agent, advised respondent that the airport would be closed on January 1, 1950. On December 29, 1949, when respondent went to the hangar to remove his plane, Parris requested him to leave his plane in appellant's hanger to help in the prospective sale of the airport, and told him that the closing of the airport would be postponed indefinitely, at least seven days. At this time respondent inquired about payment of the rent for the month of January and was told by Parris to wait as it was then undetermined to whom payment should be made. After January 1, 1950, no rent was paid by respondent nor was any charged by appellant. Respondent testified that prior to this time he had made arrangements for storage of his plane elsewhere and would not have left his plane at appellant's airport had it not been for Parris' request. On December 30, 1949, an article concerning the closing of the local airport appeared in the Roseville Press Tribune, wherein it was stated that:

"Owner Jim Dunbar said he would extend the closing date until January 7 after Leo Connell, local resident, offered an option to buy the airfield."

Respondent admitted having read this article.

Respondent testified that from December 29, 1949, until January 14, 1950, he was working in the railway snow service, was not in Roseville except to sleep and therefore had no opportunity or occasion to go to the airport. Although appellant's mechanic Parris had notified others by mail in the latter part of December that they should move their planes due to the closing of the airport, respondent denied ever having received any like notice, oral or written.

Appellant testified that by January 5, 1950, it became apparent that a sale of the airport would not be consummated and he therefore commenced closing operations, which included taking two or three planes out of the hangar and tying them down outside. It was appellant's further testimony that two days prior to the official closing of the airport on January 7, 1950, respondent was present at the airport and discussed the matter of future storage of his plane with appellant. This was denied by respondent.

On January 13, 1950, a violent storm arose with winds exceeding 60 miles per hour, as the result of which the ropes mooring respondent's plane outside the hanger pulled apart and the plane was damaged in the stipulated sum of $1,500. There was testimony of the usual practice followed in tying

down small planes and testimony that appellant had used defective rope in securing respondent's plane.

It was on the day following the storm that respondent went to the airport, discovered the damage to his plane, and proceeded, with the help of Parris, to dismantle it. Two of plaintiff's witnesses testified that the airport was open and doing business not only on the 13th and 14th of January, but also for some days thereafter. There was also testimony that at the time the damage was incurred there were no X's on the field as an official indication that the airport was closed.

The learned trial judge in his memorandum stated: "Defendant's counsel, on the other hand, contends that the bailment was, at best, a 'gratuitous' one, under Section 1844 C.C., and that as such defendant was only obligated to exercise 'slight care'; but that if the Court found that defendant was a bailee for hire, that he had exercised ordinary care for the preservation of the plane.

"After reviewing the facts, and the several contentions of counsel as set forth in their briefs, the Court has come to the conclusion that the evidence supports a holding that defendant Dunbar was a bailee for hire, and that as such he was obligated under the law to exercise ordinary care to prevent plaintiff's airplane from being damaged. There is no question but that plaintiff in the first instance had paid a monthly fee for the privilege of storing his plane in *defendant's hangar.* Under such circumstances, it has been held that the relationship of bailor and bailee came into being. (*Downey* v. *Martin Aircraft Service, Inc.*, 96 Cal.App.2d 94 [214 P.2d 581].)

"The evidence stands in the record undenied, inasmuch as defendant's said manager, John Parish [Parris], was never called as a witness, nor his deposition taken, that thereafter plaintiff had made arrangements to store his plane elsewhere, but was requested to leave his plane in storage at the airport, for the reason the plaintiff's continuing storage would help defendant in the prospective sale of the airport.

"It is settled as a general proposition of law that a person is not a gratuitous baileee when the bailment is made at his own instance, or on his invitation because of benefits, direct or contingent, expected to accrue, or in a contract express or implied for a legal consideration.

"(*Hummingbird* v. *Schurich,* 24 Cal.App.2d Supp. 757 [68 P.2d 319]; 6 Am.Jur. Page 185):

"The Court must conclude, then, that since plaintiff's airplane was left at defendant's hangar at the instance and re-

quest of defendant's agent, and for defendant's benefit, that the bailment was not in fact a gratuitous one, and that defendant was obligated to exercise ordinary care in its preservation.

"Did the evidence show the defendant exercised such ordinary care?

"The Court is of the opinion that it did not. In the first place, the airplane was removed from the hangar where it had ordinarily been stored and tied outside in an open field; the plane was left outside the hangar, even though on January 13, 1950, a storm had arisen and was in progress, and that at six-thirty p.m. of that day the wind velocity was thirty miles per hour, with gusts even as high as fifty-five miles per hour; that between eleven-thirty p.m. and twelve-thirty a.m. of the next day (during which time the plane was blown over), the wind gusts had increased to sixty miles per hour in velocity. In addition, the evidence showed that the rope which tied the plane to the ground had been used and exposed to the elements for three years, and according to plaintiff's testimony, had become 'rotten'. From all of the foregoing facts, the Court has come to the conclusion that defendant did not exercise ordinary care in the preservation of plaintiff's property, and therefore he should be held liable for damages."

The record and the authorities fully support the trial judge's conclusions as to the facts and the law. Appellant's argument is in effect an argument as to the weight of conflicting evidence. He contends that because respondent, on December 30, 1949, read an article in the Roseville Press Tribune which stated that appellant had extended the closing date of the airport until January 7th, this was sufficient actual and constructive notice to terminate the relationship of bailee for hire on January 7th. However, as appears from the record, respondent had made arrangements to store his plane elsewhere but was induced to leave his plane at appellant's airport to help appellant make a prospective sale. Under such circumstances respondent was certainly entitled to more personal notice of the closing of the airport than an article in the newspaper which merely stated that appellant would extend the closing date to January 7th. Furthermore, there was evidence tending to show that the airport was in operation by appellant even after the damage to respondent's plane.

We are satisfied that the evidence is sufficient not only to support the finding that defendant was a bailee for hire who failed to use ordinary care for the preservation of plain-

tiff's airplane (Civ. Code, §§ 1851, 1852), but also to support the implied finding that defendant as bailee had not terminated the bailment upon reasonable notice. (Civ. Code, § 1854.)

The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.